UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JULIE ANN URBANEK,

       Plaintiff,

v.                                                            Case No. 14-C-119

CAROLYN W. COLVIN,
Acting Commissioner for Social Security,

       Defendant.

## DECISION AND ORDER

This is an action for judicial review of the final decision of the Commissioner of Social Security denying the plaintiff's application for disability insurance benefits (DIB) under Title II of the Social Security Act. Plaintiff Julie Ann Urbanek seeks a remand for further proceedings on the grounds that the Administrative Law Judge (ALJ) failed to give good reasons for rejecting her treating psychiatrist's opinion and failed to account for all of Urbanek's mental impairments in the residual functional capacity (RFC) determination. For the reasons below, the Commissioner's decision will be affirmed.

## I. BACKGROUND

### A. Record

Ms. Urbanek has been treated for mental health issues since at least 2006. (Tr. 210.) At that time, she was treated by a psychologist, John Johnson, Ph.D. Dr. Johnson's notes from March 2006 show Urbanek's work as a medical transcriptionist caused serious stress. Johnson recommended several coping mechanisms, including better work-life balance. (Tr. 219.) Later records would show

Urbanek was working 60-hour weeks as a medical transcriptionist before she quit in 2010. Urbanek was also treated by a psychiatrist, Dr. Ashraf Ahmed, beginning in at least 2009. At that time she was on a number of medications, including Adderall, Xanax, Valium, Prozac and Geodon. (Tr. 237.) She continued seeing Dr. Johnson in 2009 as well, and Johnson's notes indicate that at that time, Urbanek was working "almost obsessively" and that she "always seems to get worse with the more pressure she puts on herself." (Tr. 223.) Records from October 2009 show Ahmed observed pressured speech and flight of ideas by Urbanek, and that Ahmed diagnosed deficit hyperactivity disorder (ADHD), inattentive type; bipolar disorder, not otherwise specified (NOS); and anxiety disorder, NOS. (Tr. 233.)

In February 2010, Urbanek saw Dr. Ahmed and complained of feeling very angry, frustrated, irritable and moody. (Tr. 229.) She stated she could not focus or concentrate and she feared losing her job. (*Id.*) Ahmed noted difficulties with anger, moodiness and concentration, as well as pressured speech and flight of ideas. On March 23, 2010, Urbanek complained of the same symptoms and frustrations to Ahmed. He diagnosed bipolar disorder type I, with most recent episodes mixed and moderate. Ahmed noted that he discussed coping mechanisms with Urbanek for dealing with her current crisis, and at the end of the 20-minute appointment she decided to retire from her job and apply for disability. (Tr. 228.) Urbanek would testify in the hearing that when she stopped working, she received $1,000 under a disability insurance policy, and that her carrier required her to apply for DIB. (Tr. 39.) In a follow-up with Ahmed in April 2010, Urbanek continued to complain of the same symptoms and Ahmed noted she showed a lot of pressured speech, flight of ideas, circumstantiality, anger and irritability but no suicidal or homicidal ideas. (Tr. 227.)

2

As planned, Urbanek quit her job March 23, 2010 and filed for DIB benefits. A questionnaire returned to the Social Security Administration (SSA) by Urbanek's employer shows she worked since September 2007 as an independent contractor/at home transcriptionist making 9 cents per line transcribed. (Tr. 193.) Her employer noted her punctuality was satisfactory even though there were some absences and only partial productivity. At the hearing, Urbanek stated that she worked for 18 years for a group of surgeons until she was fired, and then she worked from home for another company from 2007 to 2010 when she quit. She stated she quit the latter job because her employer had given her an ultimatum that if her work did not improve, she would be terminated. (Tr. 49.) In her appliabtion for disability, she alleged disability starting on March 23, 2010 due to depressive disorder, ADHD, bipolar disorder, anxiety disorder and panic disorder with agoraphobia. The SSA sent psychiatric questionnaires to Drs. Ahmed and Johnson. Ahmed did not fill out the questionnaire, but Johnson completed the form on July 29, 2010. (Tr. 251–53.) Johnson described Urbanek as having extreme difficulty with focus and concentration, especially related to her job; he stated her anxiety was always present, that she could not complete simple tasks and that she was emotionally volatile, especially with her husband. He also estimated Urbanek's IQ to be 110 to 115 and noted it was difficult to keep her in outpatient treatment, possibly due to financial issues. Johnson noted Urbanek's ability to understand, carry out and remember instructions was "not good" because although she understood instructions, she had great difficulty following through. Likewise, he noted her ability to respond appropriately to routine work pressures and changes in a work setting was "not good" because, according to Johnson, "work stresses her out!" (Tr. 253.)

Urbanek saw Dr. Johnson on July 2, 2010. (Tr. 286.) Johnson noted he had not seen her in quite some time (possibly due to insurance issues) and that she continues to be quite distressed

3

and depressed. Johnson noted she continues to isolate and urged her to exercise and have social interactions. Urbanek saw Dr. Ahmed in August and September 2010 for medication management. Urbanek reported feeling a little better in September; she reported not feeling as angry or upset and that she was coping much better with life. Dr. Ahmed noted she showed no anger or hostility, that she is getting along with people better and that she seemed to be pleasant. He continued the medication regimen of Zoloft, Geodon, Thorazine, Diazepam and Adderall. (Tr. 278.) In a follow-up on December 13, 2010, her symptoms had returned. (Tr. 427.)

The SSA referred Urbanek to Robert J. Schedgick, Ph.D, for a consultative examination on December 28, 2010. Dr. Schedgick performed a psychological evaluation and completed a 15-page report. (*See* Tr. 288–302.) Urbanek's chief complaints were as follows: As to depression, she reported low energy, sadness and crying spells. As to bipolar mood disorder, she reported manic episodes in which she has rage and anger. As for anxiety, she reported trembling hands and panic attacks. She showed Dr. Schedgick her hands and Schedgick noted "It does appear to be an intention tremor. It is quite mild." (Tr. 290.) Dr. Schedgick later noted there was no sign of the tremor for the rest of the examination. (Tr. 297.) The panic attacks happened about twice a month, last 30 to 40 seconds, and involve difficulties breathing, increased heart rate and chest pains. Urbanek later described them as mild, and Dr. Schedgick stated they appeared to be "extremely mild." (Tr. 295.) Dr. Schedgick also wrote:

> She then adds that she continues to have depression symptoms. She says it happens every day. At the present time she defines her level of depression at a 7 on a scale from 0 to 10 with 10 being suicidal and ready to enter into the hospital due to sadness and depression. The examiner asks why she felt this way; and she says, "I

4

can't do anything." The examiner did not see any facial expressions, vocalizations or movements suggesting that she was experiencing this level of depression. The examiner would have rated it close to 0 or 1.

(Tr. 290.)

As for work history, Urbanek told Dr. Schedgick she had not worked since March 23, when she quit her medical transcriptionist job after 23 years. She reported that she was working about 60 hours a week at that job. She reported she did not have problems with quality or quantity of work until the end of her employment, when she had difficulties concentrating and was making mistakes while working remotely from home. (Tr. 290.) As for medications, Urbanek reported not taking them at least twice a week. (Tr. 291.) Dr. Schedgick noted some confusion as to the results of her mental status exam. She appeared to have difficulty with the serial seven task, but no difficulty with other mental tasks. (Tr. 292–93.) Although Dr. Schedgick described Urbanek as cooperative and pleasant, she described her mood on that day as "very depressed." (Tr. 295.) She stated she was scared because her "life [was] in [his] hands" since Dr. Schedgick was "going to determine [her] disability." (*Id.*) As for pain, she stated she was at a 6 out of 10 during the interview, but the examiner noted he would rate it at 0 because there were no vocalizations, facial movements or expressions suggesting any pain or discomfort throughout the entire interview. (Tr. 297.) She reported she spent 3 to 5 hours a day yelling and screaming at her husband. (Tr. 298.) Dr. Schedgick also interviewed Urbanek's husband, who did not identify difficulties with Urbanek's verbal expressions now or in the past. Dr. Schedgick noted the husband's report was inconsistent with the reports of pressured speech and flight of ideas in her medical records. (Tr. 299.)

Dr. Schedgick concluded: "The examiner is a bit confused about the prior reports. The symptoms being described at that time appear to be more serious and intense than those being

5

identified during the interview of this date. The examiner notes that the [claimant's husband] could not provide adequate information for this symptomology as well." (Tr. 300.) Dr. Schedgick diagnosed general anxiety disorder, dysthymia, panic disorder and noted Urbanek's history of bipolar diagnosis. Dr. Schedgick found her feelings of anxiety appeared to be mild; her periods of irritability did not appear to be as frequent as she presented; she had "some difficulties perhaps with concentrating and focusing"; her panic attack disorder was "very mild" and not accompanied by agoraphobia. (Tr. 300–01.) Dr. Schedgick gave her a GAF of 70–75, indicating mild-to-slight symptoms. (Tr. 301.) Dr. Schedgick ended the report by listing a long line of impressions, including: "She can adequately focus and concentrate if she chooses to do so"; "She probably can follow simple and complex demands without difficulty"; "She has some difficulties in handling social conflicts. Apparently, she can become angry for short periods of time. Perhaps with some counseling she could begin to resolve these problems and learn a better way to cope with interpersonal conflicts." (Tr. 301–02.)

In January 2011, Urbanek reported to Dr. Ahmed she was doing much better, but by June 2011, she was back to feeling very depressed. (Tr. 426, 425.) In September 2011, apparently because her insurance did not cover her therapy with Dr. Johnson, Urbanek saw Brian Cagle, Psy.D. (Tr. 422.) When asked by Dr. Cagle why she thought she was struggling, Urbanek responded: "I think I was overworked, 60 hours per week. It hasn't stopped, though, since I've been off work. I think my body just shut down." (Tr. 423.) Cagle wrote: "What Julie described sounded as though she had a relatively severe Major Depressive episode and has continued to have difficulty recovering from it." (*Id.*) Cagle noted that Urbanek's affect was mildly-to-moderately anxiously depressed and her mood was moderately anxiously depressed. Cagle gave her a GAF of 55, indicating moderate

6

symptoms. Cagle's notes for an October 4 psychotherapy session state:

> The patient had a very productive psychotherapy session. She said that she followed all of my recommendations except joining a health club. . . . [O]ther than that, she said that she has been walking her dog approximately 1 1/4 miles every other day. She said that she and the dog enjoy that quite a bit. She has been more active socially and is getting ready to start a volunteer position that she will go to two times per month. Even today, the patient's mood was improved. She smiled quite a bit more. She said that her husband was very pleased that she went to a wedding with him that she would not have gone to in the past. We continued to talk about some practical things that she can do to improve her mood. . . .

(Tr. 420.) Two weeks later, Cagle wrote: "Julie said that she feels as though her mood is improved a bit and that she is doing better. It was quite apparent that that is the case." (Tr. 419.) Urbanek reported to Dr. Ahmed on October 24 that she was doing a lot better. (Tr. 418.) Notwithstanding some complaints of familiar symptoms, Urbanek continued to give positive reports to Dr. Ahmed from December 2011 to June 2012. (Tr. 428, 429, 438.)

Dr. Ahmed completed mental RFC questionnaires on February 3, 2011 and May 17, 2012. (Tr. 322–29, 430–37.) They each contained similar findings, except the earlier assessment did not provide a GAF score and later provided a GAF of 50, indicating serious symptoms. In the questionnaires, Dr. Ahmed opined that Urbanek was unable to maintain persistence and pace to engage in competitive employment; that her attempt to return to work would markedly increase the severity of her symptoms and she would likely decompensate; that she had "no useful ability" to, among other things: understand, remember and carry out detailed job instructions; deal with coworkers, supervisors and the public; deal with changes in routine work setting; concentrate for a two hour segment; or complete a normal workday or work week without interruptions from

7

symptoms. (*See* Tr. 327–28) (checking "no useful ability to function" option for 10 of 13 work-related activities). Ahmed also opined that Urbanek's symptoms would cause her to miss work four or more times per month. (Tr. 328, 436.)

**B. Hearing and ALJ's Decision**

A video hearing was held before an ALJ on July 11, 2012. Urbanek testified that her typical day consists of waking up to have coffee with her husband, and then laying on the couch all day. (Tr. 41.) Once a week she would drive to a girlfriend's house. (*Id.*) She testified that she does not travel, but then admitted traveling to Minnesota the week before the hearing to visit her daughter. (Tr. 43.) When asked if her depression was getting better with treatment, Urbanek said no. She had to stop seeing the psychologist because she could not afford the insurance deductible and she was only seeing Dr. Ahmed for medication management at the time. (Tr. 45.) When asked about the signs of improvements evident in Dr. Cagle's treatment records, Urbanek testified that that was during one of her "manic states" and that she has since stopped walking due to a hurt foot and she never did volunteer except for one or two times because she got too nervous. (Tr. 50–51.) Upon questioning from her attorney, Urbanek testified that she would have about one good day a month. (Tr. 51.) She also described an incident at her old job where she became enraged and threw a chart at a doctor. (Tr. 53.)

On September 18, 2012, the ALJ issued a written decision. He found Urbanek had severe impairments of bipolar disorder II, depressive disorder, generalized anxiety disorder and dysthymia. (Tr. 19.) At step three of the sequential evaluation process, the ALJ found Urbanek's impairments

8

did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19–20.) The ALJ considered whether the "paragraph B" criteria were satisfied and concluded:

> [C]oncerning the claimant's functional limitations because of her mental impairments, the undersigned finds that the claimant had moderate restrictions in her social functioning and in her ability to maintain adequate concentration, persistence or pace. The claimant had a mild limitation with her activities of daily living. The record does not show that the claimant had an episode of decompensation of an extended duration.

(Tr. 20.)

The ALJ proceeded to find Urbanek had the RFC "to perform a full range of work at all exertional levels" but imposed nonexertional restrictions such that "the claimant is limited to unskilled work involving simple, routine and repetitive tasks, that allows her to be off task 5% of the workday, a low-stress job setting (occasional change in the job setting, occasional decision making and no fast-paced production), with no interaction with the public and occasional interaction with co-workers." (*Id.*) In support of that determination, the ALJ described Urbanek's complaints and found "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 21.) The ALJ then discussed the medical evidence from the notes of Urbanek's treating physicians, Drs. Ahmed and Johnson, as well as the psychological evaluation performed by Dr. Schedgick. (Tr. 23.) The ALJ also discussed his findings that Urbanek's limitations in social functioning and concentration, persistence or pace were moderate, and that her limitations in activities of daily living were only mild. (Tr. 23–24.) The ALJ he gave "little weight" to the opinions of Ahmed and Johnson; "substantial weight" to Schedgick's opinion; and "significant

weight" to the state agency medical consultants' opinions, except for their opinions as to Urbanek's activities of daily living, which the ALJ found less limited than the consultants had found. (Tr. 24–25.)

At step four, the ALJ found Urbanek could not perform her past relevant work. But at step five, based on hearing testimony from a vocational expert, the ALJ found there were a significant number of jobs in the national economy—such as order clerk, food preparation, general office helper, or dishwasher—that Urbanek could perform. Accordingly, the ALJ concluded that Urbanek was not under a disability from March 23, 2010 to the date of the decision, September 18, 2012. The Appeals Council denied review and Urbanek filed this motion for judicial review under 42 U.S.C. § 405(g).

## II. ANALYSIS

On judicial review, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court will overturn the Commissioner's final decision only if it lacks support by substantial evidence, is grounded in legal error or is too poorly articulated to permit meaningful review. *Hopgood ex rel. L.G. v. Astrue,* 578 F.3d 696, 698 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Powers v. Apfel,* 207 F.3d 431, 434 (7th Cir. 2000).

**A. Treating Physician's Opinion**

Urbanek's primary argument is that the ALJ violated the "treating source rule" by rejecting the mental RFC questionnaires that she asked Dr. Ahmed complete (Tr. 322, 430) without giving "good reasons" for doing so. *See* 20 C.F.R. § 404.1527(c)(2); *Bauer v. Astrue*, 532 F.3d 606 (7th

10

Cir. 2008). As the Seventh Circuit has stated:

> Normally, [a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record. However, while the treating physician's opinion is important, it is not the final word on a claimant's disability. As we previously have noted,[t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. An ALJ thus may discount a treating physician's medical opinion if it the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.

*Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (internal quotation marks and citations omitted).

Urbanek goes to great lengths to describe the evidence that she believes constituted substantial evidence to support Ahmed's opinion. Such evidence includes Dr. Johnson's opinion and treatment notes, Dr. Cagle's treatment notes from late 2011, and the questionnaire submitted by Urbanek's former employer. (*See* Pl.'s Br. 6–9, ECF No. 8.) Some of this evidence certainly favors Urbanek's claim for disability; some does not. For example, Urbanek cites Cagle's records for support even though Cagle did not diagnose bipolar disorder and found no more than mild and moderate symptoms, which is a much different assessment than given by Ahmed.

The ALJ is not required to give Ahmed's opinion controlling weight if it is inconsistent with the opinion of a consulting physician's opinion. *Schmidt*, 496 F.3d at 842. As Urbanek readily admits, Schedgick's report "tells a somewhat different story" than evidence more favorable to her does. (Pl.'s Br. 10.) In other words, Ahmed's opinion was inconsistent with the opinion of the consulting physician. Accordingly, the ALJ is permitted to discount Ahmed's opinion "as long as he minimally articulate[d] his reasons" for doing so. *Schmidt*, 496 F.3d at 842; *Bauer*, 532 F.3d at

608 ("There was evidence—the report of the nonexamining consultant—that contradicted the reports of the treating physicians. So the presumption falls out and the checklist [of factors under 20 C.F.R. § 404.1527(c)] comes into play.").

I find the ALJ more than "minimally articulated" his reasons for discounting Ahmed's opinion and that he provided adequate reasons in light of the regulatory factors. The ALJ noted that Ahmed's conclusion that Urbanek has had four or more episodes of decompensation of an extended duration was not supported by any explanation and was also not consistent with Urbanek's hearing testimony or the overall medical record. (Tr. 24.) The ALJ noted that Ahmed's conclusion was also not based on a mental status examination. (Rather than any mental status examination, Ahmed's notes show only short medication management appointments.) Additionally, the ALJ noted that at the same time that Ahmed completed each of the mental RFC questionnaires, in which he opined she had "no useful ability" regarding almost every mental activity listed, Urbanek's treatment records showed significant signs of improvement in her symptoms. (*Id.*) These reasons comport with the regulatory factors regarding an ALJ's obligation to consider the treating relationship, the supportability of the opinion, the consistency of the opinion, and so on. *See* 20 C.F.R. § 404.1527(c).

Urbanek attacks Schedgick's findings as apparently based on an incomplete review of the records. (Pl.'s Br. 10) ("it does not appear that the examiner was provided with a copy of Ms. Urbanek's medical records, or at least a complete copy, as the examiner complained that there was 'confusion about the prior reports'"). But it is clear from Schedgick's report that his confusion about the prior records has nothing to do with an incomplete record. Under the subheading "malingering and factitious behavior," Schedgick wrote:

12

> The examiner is a bit confused about the prior reports. The symptoms being described at that time appear to be more serious and intense than those being identified during the interview on this date. The examiner notes that the collateral person [i.e., Urbanek's husband] could not provide adequate information for this symptomology as well.

(Tr. 300.) Thus, his confusion is due to inconsistency between his findings and Urbanek's prior reports. Urbanek also attacks Schedgick's findings as inconsistent with the record. (Pl.'s Br. 10.) But Urbanek misses the point again—the fact that Schedgick's findings are inconsistent with other doctors' does not mean that they are illegitimate, it means the ALJ must weigh the opinions and findings against each other. *Cf. Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("When treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision.").

Urbanek also argues, relying on *Punzio v. Astrue*, 630 F.3d 704 (7th Cir. 2011), that the ALJ improperly cherry-picked evidence from the record when he cited and relied on Urbanek's reports to Ahmed that her symptoms were improving. (*See* Tr. 22, 24.) In *Punzio*, the court of appeals reversed on the grounds that the ALJ found the claimant not credible without any explanation and dismissed a treating source opinion without a "sound explanation." 630 F.3d at 709–10. With respect to the treating source opinion, the court held the ALJ failed to give the required "good reasons" when he dismissed it because it contradicted that doctor's own treatment notes and because it was solicited by the claimant's attorney. *Id.* at 710. The court held the latter reason was improper and the former was unwarranted in that case. In fact, the treating physician's opinion was actually amply supported by her own and other doctors' treatment notes. *Id.* at 710. The court found that the evidence the ALJ cited, including one GAF score of 60, was "cherry-picked" from the record. The court explained that

> a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition. The ALJ ought to have analyzed whether [the treating physician's] mental-residual-functional-capacity questionnaire was consistent with her treatment notes as a whole.

*Id.* (citations omitted).

Here, however, the ALJ did not rely on a snapshot of a single moment in time. He cited evidence from October 2010, January 2011, October 2011, April 2012 and June 2012. (Tr. 22.) He cited the GAF score of 55 provided by Dr. Cagle, who noted in October 2011 that Urbanek "actually feels very motivated and very excited about her life." As noted above, the ALJ provided "sound explanation" of his dismissal of Ahmed's opinion. Further, unlike the ALJ in *Punzio*, the ALJ here did so based on a fair assessment of Dr. Ahmed's treatment notes as a whole, as well as Urbanek's record as a whole. Accordingly, I find that substantial evidence supports the ALJ's decision to give Ahmed's opinion "little weight."

**B. RFC**

Urbanek also argues that the ALJ's mental RFC assessment does not account for all of Urbanek's individual impairments and limitations demonstrated in the record. She argues the RFC fails to include limitations established by Dr. Ahmed's records, which is a point that really just reiterates the primary argument discussed above. But she also argues the RFC fails to include limitations that the ALJ found *did* exist—moderate limitations in concentration, persistence or pace. (Pl.'s Br. 16, ECF No. 8.) Based on this finding, Urbanek contends the ALJ's RFC assessment was improperly minimalist. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619–620 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009).

The Seventh Circuit has made clear under these cases that a hypothetical question or RFC limiting a claimant to "simple" tasks does not adequately account for moderate limitations in concentration, persistence or pace. The court has also stated there is no per se requirement that those words be incorporated in all cases. *O'Connor-Spinner*, 627 F.3d at 619. Indeed, other phrasing that is incorporated in the hypothetical can account for such limitations. *Id.* ("We also have let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform. We most often have done so when a claimant's limitations were stress- or panic-related and the hypothetical restricted the claimant to low-stress work.").

Here, the ALJ did restrict Urbanek to "simple" work in the RFC. He also restricted her to work to unskilled, routine and repetitive tasks, as well as to work that allows her to be off task 5% of the workday, to work in a low-stress job setting (occasional change in job setting, occasional decision making and no fast-paced production) and work with no interaction with the public and occasional interaction with co-workers. Although this RFC would not account for Dr. Ahmed's findings, those were legitimately rejected. Under these circumstances, I find this RFC adequately accounted for the ALJ's findings of moderate limitations in concentration, persistence or pace. Urbanek's argument that the ALJ failed to adequately explain his reasons for excluding limitations in concentration, persistence or pace is therefore rejected because the limitations he found were not excluded.

## III. CONCLUSION

For all of these reasons, the decision of the commissioner is affirmed.

Dated this 21st day of November, 2014.

                                                s/ William C. Griesbach
                                                William C. Griesbach, Chief Judge
                                                United States District Court